**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THEODORE ADAMS, derivatively on behalf of VIRTU FINANCIAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL T. VIOLA, DOUGLAS A. CIFU, VINCENT VIOLA, WILLIAM F. CRUGER JR., VIRGINIA GAMBALE, JOSEPH J. GRANO, JOANNE M. MINIERI, JOHN D. NIXON, CHRISTOPHER C. QUICK, DAVID URBAN, JOSEPH MOLLUSO, ALEX IOFFE and SEAN GALVIN, <br><br> Defendants, <br><br> and <br><br> VIRTU FINANCIAL, INC., <br><br> Nominal Defendant. | Case No. 1:25-cv-1688 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Theodore Adams ("Plaintiff"), derivatively for the benefit of nominal defendant Virtu Financial, Inc. ("Virtu" or the "Company"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by Virtu Financial, Inc. ("Virtu" or the "Company"), Company press releases

and earnings calls, analyst and media reports about the Company, and the complaints filed in *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, No. 1:23-cv-08072 (S.D.N.Y.) (the "SEC Action") and *In re Virtu Financial, Inc. Securities Litigation,* Case No. 23-cv-3770 (NGG) (PK) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a shareholder derivative action brought for the benefit of nominal defendant Virtu against the Individual Defendants (defined herein), all of whom are current and/or former officers and directors of Virtu, based on their non-exculpable breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.    Virtu is a New York-based financial services firm that operates both proprietary trading and client-facing businesses in the financial marketplace. This derivative case arises from the Company's egregious failure on the Individual Defendants' watch to restrict access to extremely sensitive and confidential client trading information within its own business lines, and the numerous materially false and misleading statements the Individual Defendants made about Virtu's supposed protection of such client data.

3.    Virtu is well-known as a "high-frequency trading" firm, using its self-described "cutting-edge technology" to carry out a high volume of transactions at ultra-fast speeds, using, among other things, advanced algorithms and lightning quick execution capabilities. Virtu is a leader in electronic market making for numerous asset classes, whereby it provides liquidity to financial markets by buying and selling securities at high speeds.

4.    On April 20, 2017, Virtu announced that it had reached an agreement to acquire

KCG Holdings, Inc. ("KCG") – a rival financial services firm engaging in market making, high-frequency trading, electronic execution, and other trading – for approximately $1.4 billion. KCG had a well-established agency execution business, in which it executed trades for both large money managers and major retail brokerages. Acquiring KCG represented a significant transformation in Virtu's business – from a market maker to a company that now also carried out trades for many institutional and retail clients, as an agent with a best execution mandate and a responsibility to maintain client confidentiality.

5.      As a result of acquiring KCG's trade execution business, Virtu was now going to be storing troves of extremely sensitive and confidential trade execution information on its systems. Adequately safeguarding such sensitive client information is critical for any business carrying out trades for clients, but even more so at Virtu because of its other business lines that could potentially use that information to their advantage if they were allowed access to it. In particular, both before and after the KCG acquisition, Virtu had a proprietary trading business, in which it bought and sold securities in its own account and for its own benefit. As part of the KCG acquisition, Virtu formed a new subsidiary, Virtu Americas, LLC ("VAM"), an SEC registered broker-dealer, which operated the customer-facing trade execution business acquired from KCG, as well as some of the proprietary trading business of KCG.

6.      No later than January 2018, VAM began storing extremely sensitive customer trade execution information in the ***very same database*** that also continued to hold Virtu's existing proprietary trading data. This trade execution information consisted of at least: (i) specific customer-identifying information; (ii) the name of the security; (iii) the side of the transaction (buy or sell); (iv) the execution price; (v) the execution volume; and (vi) the trading algorithm used for each order.

7.      To Virtu's proprietary traders, this information would be a granular, and essentially real time, answer key into how some of the world's largest investors were trading (and in some circumstances could be reasonably anticipated to trade), that they could use to engage in a variety of trading abuses. Defendant Douglas Cifu ("Cifu"), Virtu's co-founder and Chief Executive Officer ("CEO"), characterized the post-trading information Virtu received from its clients as "*literally the secret sauce of [] large asset managers*."

8.      Unbeknownst to stockholders, despite the highly sensitive nature of this customer-specific trading information, from at least January 2018 through April 2019, essentially *anyone* at Virtu, including its proprietary traders – who should not have been able to view any aspect of this information – *could directly access the database* and its material, nonpublic trade execution information, using widely known and frequently shared rudimentary usernames and passwords (*i.e.*, a username of "viewonly" and a password of "viewonly"). Employees entering the database with these generic credentials could access *all* of the data contained therein, with Virtu having no ability to track who accessed the database.

9.      On November 7, 2018, Virtu announced another major acquisition, this time of Investment Technology Group, Inc. ("ITG") for approximately $1 billion. ITG was a global financial technology company that, like KCG, had an extensive trade execution business, carrying out trades for major institutional investors.

10.     The same day that Virtu announced its plans to acquire ITG, the SEC issued an order against ITG and an affiliate, finding, among other things, that "[f]rom 2010 until 2017, ITG *failed to establish adequate safeguards and procedures to appropriately limit access to systems containing . . . confidential trading information*."

11.     The SEC's findings about ITG's failure to protect confidential client trading

information raised concerns in the market, including among Virtu stockholders, about Virtu's ability to protect the sensitive trading information generated and/or maintained within its business groups. To quell these concerns, defendant Cifu went on a campaign to proactively address Virtu's protection of such information. During the Fall of 2018 – when Virtu's proprietary traders had **_unrestricted access_** to execution services customers' material non-public trading information – defendant Cifu made several materially false and misleading statements, including by:

• Giving a detailed slide presentation in which he flagged Virtu's "**_existing_** safeguards to protect client information," which purportedly included "**_physical separation, logical access control and entitlement reviews_**";

• Highlighting "**_the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have_**.";

• Claiming that "**_no other firm gives this much transparency to its clients into how their information is protected_**," and that "**_Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with_**"; and

• Declaring that following the closing of the ITG acquisition, "Virtu intends to **_continue to maintain and enforce_** **_appropriate information barriers to segment and protect sensitive client data[.]_**"

12. As alleged herein, these statements (and the many others made by the Individual Defendants) misrepresented and failed to disclose that Virtu was failing to segregate and protect confidential client information in the trade execution business it was **_already operating_**. In other words, Virtu was currently engaging in the exact conduct defendant Cifu was repeatedly – and forcefully – assuring stockholders would not take place. There were **_no_** "appropriate information barriers" in place to prevent proprietary traders from accessing VAM's execution services customers' confidential trading information. Rather, they had unfettered access to this information, regarded by clients as sacrosanct, and the Individual Defendants either knew about it, or were reckless in repeatedly addressing this specific issue without knowing about it.

13.     In fact, in November 2018 – at the same time defendant Cifu was promoting Virtu's protection of client trading information – VAM *increased* by 66% the number of users who could have simultaneous access to the client database. This user limit increase came after traders complained about too many people being logged into the database at once.

14.     Nor was Virtu being either "*transparen[t]*" or "*very upfront and direct*" with (among others) its execution services customers and stockholders. For nearly five years, the Individual Defendants concealed that essentially anyone at Virtu had access to its execution customers' confidential trading information for a period of *at least* 15 months – never once even hinting at this massive problem to stockholders. Instead, the Individual Defendants misled stockholders about Virtu's protection of its clients' confidential information, including by cautioning, during every fiscal quarter, about the potential of "*[the] failure to*" maintain or protect "*confidential and proprietary information*," when that had already come to pass. Moreover, by failing to protect their clients' confidential and proprietary trading information, the Individual Defendants exposed the Company to significant financial, regulatory, and litigation risks.

15.     Sure enough, on February 17, 2023, Virtu revealed that it had been responding to requests for information from the SEC "in connection with an investigation of aspects of the Company's information access barriers." As information about the Individual Defendants' scheme was revealed to stockholders, Virtu's stock price dropped precipitously, ultimately declining to a low of just over $17 per share.

16.     The SEC would eventually bring the SEC Action against Virtu, discussed further herein, which survived a motion to dismiss and is currently set for trial in December 2025.

17.     And most recently on March 17, 2025, the related Securities Action against the Company, brought by a class of Virtu investors, survived a motion to dismiss and that case is

accordingly now proceeding towards trial as well.

18.     Through this derivative action, Plaintiff seeks to recover for the Company the damages caused to Virtu by the Individual Defendants' misconduct.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.142-9) promulgated thereunder by the SEC.

20.     This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367(a).   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because nominal defendant Virtu is headquartered in this District and conducts business in this District.

## III.     THE PARTIES

24.     Plaintiff is a current holder of Virtu Class A common stock and has continuously held Virtu Class A common stock since October 2018.

25.     Nominal Defendant Virtu is a global financial services firm, incorporated under Delaware law and headquartered in New York. Virtu leverages its technology to provide liquidity, execution services and data, analytics, and other products to its clients. Virtu Class A common stock trades on the NASDAQ exchange under the ticker "VIRT." Virtu is a holding company, with no operations of its own, that conducts its business through Virtu Financial LLC and its various subsidiaries.

26.     Defendant Cifu has served as Virtu's CEO since November 2013. Defendant Cifu previously served as Virtu's President and Chief Operating Officer ("COO") and has served on its Board of Directors (the "Board") or the boards of its predecessors since co-founding Virtu in April 2008. Defendant Cifu is a former partner at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, who admits to being aware of "***the mandates of the 34 Act***."

27.     Defendant Vincent Viola ("V. Viola") has served as a director of the Company since November 2013. Defendant V. Viola is one of the Company's co-founders, is its former CEO, and currently is serving as "Executive Chairman" of the Board.

28.     Defendant Michael T. Viola ("M. Viola") has served as a director of the Company since April 2016. Defendant M. Viola currently serves as Virtu's Chairman. Defendant M. Viola is a former senior trader at the Company and is the son of defendant V. Viola. Defendant M. Viola serves as President of the Viola Family Office, a private investment office for the family of defendant V. Viola.

29.     Defendant William F. Cruger, Jr. ("Cruger") has served as a director of the Company since 2014. Defendant Cruger also is the Chair of the Company's Audit Committee.

30.     Defendant Virginia Gambale ("Gambale") has served as a director of the Company since 2020. Defendant Gambale also serves on the Company's Risk Committee.

31.     Defendant Joseph J. Grano ("Grano") has served as a director of the Company since 2017. Defendant Grano also serves on the Company's Audit and Compensation Committees.

32.     Defendant Joanne M. Minieri ("Minieri") has served as a director of the Company since 2021. Defendant Minieri also serves on the Company's Audit and Nominating and Governance Committees.

33.     Defendant John D. Nixon ("Nixon") has served as a director of the Company since 2015. Defendant Nixon serves on the Company's Audit and Nominating and Governance Committees.

34.     Defendant Christopher C. Quick ("Quick") has served as a director of the Company since 2016. Defendant Quick serves on the Company's Compensation and Nominating and Governance Committees.

35.     Defendant David J. Urban ("Urban") has served as a director of the Company since 2018. Defendant Urban is a member of the Company's Risk and Compensation Committees.

36.     Defendants V. Viola, Cifu, M. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick and Urban are referred to herein as the "Board".

37.     Defendant Joseph Molluso ("Molluso") has served as Virtu's Co-President and Co-COO since May 2020. Defendant Molluso joined Virtu in November 2013 as its Chief Financial Officer ("CFO") and served in that role until a brief departure from Virtu, beginning in September 2019. Defendant Molluso is a defendant in the related Securities Action.

38.     Defendant Alex Ioffe ("Ioffe") served as Virtu's Executive Vice President ("EVP") and CFO from September 2019 until August 2020. Defendant Ioffe is a defendant in the

related Securities Action.

39.    Defendant Sean Galvin ("Galvin") has served as Virtu's EVP and CFO since August 2020. Defendant Galvin previously served in various roles at KCG, which, as described above, was acquired by Virtu in June 2017. Defendant Galvin is a defendant in the related Securities Action.

40.    Defendants Cifu, Molluso, Ioffe, and Galvin are collectively referred to herein as the "Officer Defendants".

41.    Defendants V. Viola, Cifu, M. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick, Urban, and the "Officer Defendants" are collectively referred to as the "Individual Defendants".

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

42.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over

the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

44.    At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

45.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

    b.    neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

    c.    establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    d.    neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

    e.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

## V.     SUBSTANTIVE ALLEGATIONS

### A.    The Company and Its Business

47.    Co-founded in 2008 by defendants Cifu and V. Viola, Virtu, together with its subsidiaries, is a global financial firm that uses its self-described "cutting-edge technology" to provide a variety of financial services and products in markets around the world.

48.    Virtu is well-known as a "high frequency trading" firm. High-frequency trading is a trading method using powerful computer programs to transact many orders in just fractions of a second – as fast as nanoseconds – using complex algorithms to execute the orders. These algorithms utilize large datasets of historic market behavior to profitably trade with both customers and market participants.

49.    Originally scheduled to go public in April 2014, Virtu postponed its initial public offering (IPO) until April 2015, following a storm of negative attention from the release of Michael Lewis' book "*Flash Boys*," alleging the stock market is rigged in favor of high-frequency traders because of the algorithms they employ to execute orders at very fast speeds and the incentives that certain stock exchanges provide to them.

50.    Prior to mid-2017, Virtu operated as a single reportable business segment. Nearly all of its revenue came from its market making business. Market making is a form of trading where a trader or firm simultaneously offers to buy and sell securities with the hope of collecting the difference between those prices, known as bid/ask spreads. Market makers provide liquidity by continuously supplying bid and ask prices to ensure there is a liquid market for buyers and sellers of securities to transact.

51.    These small spreads add up over the course of millions of trades. According to an August 11, 2016 *Bloomberg* article, "[r]ather than go for big trades that could blow up and lose a lot of money, Virtu prides itself on making small amounts—as in $10—millions of times a day."

In 2021 and 2022, Virtu's net trading income from its Market Making segment totaled $2.1 billion and $1.6 billion, respectively.

52.     Today, Virtu makes markets in the cash, futures, and options markets across global equities, fixed income, currencies, cryptocurrencies, and commodities in 37 countries worldwide, using high-frequency trading strategies.

**B. Virtu Acquires Its Rival KCG**

53.     On April 20, 2017, Virtu announced it had reached an agreement to acquire KCG in a cash transaction valued at $20.00 per KCG share, or a total of approximately $1.4 billion. KCG, formed in December 2012 from the merger of New Jersey-based Knight Capital Group and Chicago-based Getco LLC, was a financial services firm engaging in market making, high-frequency trading, electronic execution, and institutional sales and trading.

54.     A Company presentation the same day promoted the benefits of acquiring KCG, in pertinent part, as follows:



55.    Before acquiring KCG, Virtu did not have a significant trade execution business of its own. But, with this acquisition, Virtu acquired KCG's extensive agency brokerage business.

56.    Agency brokers execute trades on securities markets on behalf of their clients. Distinct from a market maker, agency brokers are simply charged with finding the best possible execution on behalf of their clients and do not hold inventory of the securities they buy and sell. When an executing broker is acting as an agent, there is a presumption that most of those executions would occur against an exchange, Alternative Trading System (one type of which is known as a dark pool), or other market participants – and not the firm executing the trade.

57.    Virtu's acquisition of KCG represented a transformative shift in the Company's business model. As an April 20, 2017 *Bloomberg* article reporting on the acquisition explained, "[a]lthough New York-based Virtu and KCG compete in markets including stocks, futures, currencies and bonds, the deal pushes Virtu into business lines it has shied away from. That new terrain includes ***carrying out trades for big money managers and filling individual investors'***

*trades on behalf of retail brokerages* such as E*Trade Financial Corp. and TD Ameritrade Holding Corp."

58.     As further described by *Bloomberg*, "Virtu, which has acted as a market-maker for the majority of its existence and only recently started doing transactions for customers, is seeking to broaden its access to institutional and retail clients. KCG has hundreds of customers they arrange trades for in their agency business, Cifu said, while Virtu has fewer than 10." According to a press release issued by Virtu, the acquisition would "extend Virtu's scaled operating model to KCG's wholesale market making businesses and broaden the distribution of Virtu's technology and execution services to KCG's extensive institutional client base."

59.     In a televised interview with *Bloomberg* the same day, defendant Cifu described the gravity of acquiring KCG's agency execution business, as follows: "KCG has a fabulous institutional practice institutional agency business, where they have literally hundreds of customers. We started this a year ago – we['ve] got less than ten customers. We've got a great product. In an execution-only environment, we think we can be exceedingly competitive…We think marrying the algorithmic business that we have, some of the post-trade analytics that we have, with their extensive client base, we really think we can build a winning product[.]"

60.     According to Virtu's April 20, 2017 presentation, the acquisition of KCG was expected to significantly expand Virtu's overall net revenues attributable to execution services, from 2% to almost *20%*:





61.    In the wake of the announcement, analysts wrote favorably about Virtu's new access to KCG's institutional client-base for its agency execution business. For example, on April 20, 2017, a UBS analyst wrote as follows:

**VIRT gains access to KCG's institutional client base on the agency side**

In addition to acquiring KCG's high-profile retail market making business (#2 in the industry), VIRT will also be moving upstream to provide its superior order execution and post-trade analytics to KCG's already-established institutional client base. The deal accelerates VIRT's efforts to diversify into agency execution (~20% of revenue post deal) at a time when regulations could drive more flow to execution specialists.

62.    Virtu announced the completion of the KCG acquisition on July 20, 2017. After the deal closed, defendant Cifu continued to boast about the significance of acquiring KCG's agency execution business. On Virtu's August 8, 2017 earnings call, defendant Cifu stated that

"[w]e think one of the great strengths that Virtu had on the agency side with our offering was superior execution quality but also transparency into how orders were routed and whatnot. So now taking that product, if you will. And offering that to all the great legacy KCG customers, a lot of whom I've already met and are meeting more both in Europe and the United states is a significant opportunity for us."

63.     As a result of the KCG acquisition, Virtu added a second reportable segment – Execution Services. Through its Execution Services business, Virtu now offered agency-based, execution-only trading, whereby the Company utilizes its technology to execute trades for some of the largest institutional investors in the world, including mutual funds, pension plans, plan sponsors, hedge funds, and trusts and endowments, earning a commission.

64.     After acquiring KCG, Virtu formed VAM, an SEC registered broker-dealer, which operated the customer-facing trade execution business acquired from KCG, as well as some of the proprietary trading business of KCG. According to Virtu's Annual Report on SEC Form 10-K for the year ended December 31, 2022, VAM is Virtu's "principal U.S. subsidiary," through which Virtu "primarily conducts [its] Americas equities business." Under the Individual Defendants' direction, Virtu reports its financial statements on a consolidated basis, which includes Virtu's equity interests in VAM and its numerous other subsidiaries.

65.     The addition of KCG's execution business created a natural conflict within the walls of Virtu that needed to be addressed immediately. That is, the Company now maintained a trove of confidential information with granular details into how some of the largest investors in the entire world were trading, which, if left unprotected, could be exploited by proprietary traders within the Company, for Virtu's own financial benefit.

    **C. Virtu Begins Loading Extremely Sensitive Trade Execution Information Onto Its Systems, But Fails to Block Its Proprietary Traders From Having Access**

to It

66.     No later than January 2018 – just five months after the KCG acquisition closed – VAM began storing extremely sensitive customer trade execution details generated from VAM's customer orders in the ***same database*** that also continued to hold Virtu's proprietary trading data.

67.     The trading information stored in VAM's primary database for daily business operations, as well as a backup database (together, the "FS Database") consisted of the following:

- specific customer-identifying information;

- the name of the security;

- the side of the transaction (buy or sell);

- the execution price;

- the execution volume; and

- the trading algorithm used for each order.

68.     Notwithstanding the highly sensitive, customer-specific, nature of this information, from at least January 2018 through April 2019, essentially ***anyone*** at Virtu, including its proprietary traders – who were supposed to be walled off from accessing such information – could directly access the FS Database and its material, nonpublic information, using widely known and frequently shared generic usernames and passwords.

69.     The primary FS Database could be accessed by essentially any employee at Virtu, by using rudimentary login credentials consisting of a username of "viewonly" and a password of "viewonly." Similarly, the backup FS Database could be accessed by virtually any employee by entering a username of "fsviewonly" and a password of "fsviewonly." These credentials were not unique to any individual employee at the Company.

70.     Employees entering the FS Database with these generic – and widely known and

frequently shared – login credentials could access **all** of the data contained therein, including, but not limited to, customer-specific and virtually real-time post-trade information – regardless of their role at Virtu, or their business purpose.

71.     Throughout the entire time this sensitive data was left unprotected, Virtu did not monitor which specific employees were accessing the FS Database using the generic usernames and passwords, or what information proprietary traders viewed, or used.

72.     At one point, Virtu's traders even complained internally about the number of users accessing the FS Database simultaneously via the generic login credentials. For example, in a June 2018 chat conversation, one proprietary trader wrote to another that they would be less likely to encounter alerts that the system had exceeded the number of permitted users if they shielded the "fsviewonly" username and password for the backup FS Database. That trader joked about the prospect of selling "subscriptions" to the generic log-in credentials "for like a buck each."

73.     In August 2018, VAM developers began discussing the need to improve the insufficient permissioning for the FS Database – which they were aware included the unrestricted access of Virtu's proprietary traders to customers' post-trade information. For example, on August 13, 2018, more than 20 employees from different departments at Virtu received an email indicating that the FS Database was in need of a "revamp" to fix the permissioning.

74.     The detailed material non-public information contained in Virtu's FS Database would be extremely valuable to a proprietary trader because it, among other things, provided a direct window into how VAM's large institutional clients were trading, and in certain cases, could be reasonably anticipated to trade, in which securities, and in what precise amounts.

75.     Defendant Cifu would characterize the post-trade information Virtu received from its large clients, to run analytics on, as follows:

The 38 or so or more of the top 50 asset managers in the world give us *their entire trade blotter at the end of the day* so that we can run analytics on it. Think about the trust that you've built with the buy side if someone will do that. *That is literally the secret sauce of all these large asset managers.* Having a client list like that is priceless, as the Visa commercial says.

76.     The vast amount of confidential client post-trade information Virtu left unprotected could, in a variety of situations, easily be abused by its proprietary traders, as it could help them better understand market dynamics and predict future price action.

77.     For example, as many of VAM's clients were large institutional investors, if a client purchased a stock on consecutive days, it could be assumed that it would continue to do so, as many orders would be executed over multiple days given their size. A proprietary trader could then purchase that security for Virtu's own benefit ahead of that customer's future anticipated transactions.

78.     Similarly, if a proprietary trader observed that a large execution services customer had stopped buying the same stock it had been continually purchasing large amounts of, the proprietary trader could use that information to sell the same stock presuming the price of that stock would subsequently fall.

79.     Also, because proprietary traders could see historic orders placed in VAM's trade execution business, proprietary traders had the ability to run statistical analyses to generate additional trading opportunities. For instance, a proprietary trader could observe that a certain customer was consistently profitable in a particular strategy and replicate it.

80.     Moreover, because proprietary traders could see the actual identities of the customers whose information was stored in the FS Database, they could use this trading information to their advantage in a situation where, for example, an activist investor was acquiring large amounts of shares of a particular company in advance of a strategic transaction.

81.    By acquiring KCG, Virtu also took on KCG's robust retail execution business in which it carried out trades for major retail brokerage clients such as E*Trade Financial Corp. and TD Ameritrade Holding Corp. After combining the companies, VAM handled approximately *25% of all market orders placed by retail investors in the United States*. As a result, the FS Database now contained a trove of post-trade information from both institutional and retail investors, readily accessible to Virtu's proprietary traders.

> **D. Defendant Cifu Promotes Virtu's Protection of Sensitive Client Trading Information While at the Same Time, Access to Sensitive Client Trading Information in the FS Database Was Completely Unrestricted**

82.    On November 7, 2018, the Individual Defendants caused Virtu to announce its financial results for the quarter ended September 30, 2018 and revealed that the Company had entered into a definitive agreement to acquire ITG for approximately $1 billion. At the time, ITG was a global financial technology company that was an independent agency broker and financial technology provider specializing in institutional liquidity, execution services, analytical tools and proprietary research.

83.    ITG ran a full-service institutional agency brokerage executing trades for more than 1,000 firms, including mutual, pension and hedge funds, in equities, options, futures and FX, while offering research and a trading desk. According to materials published by Virtu, ITG's business was to be "combined with Virtu's existing agency brokerage business," largely developed in connection with the acquisition of KCG.

84.    The *same day* that the Individual Defednants announced Virtu was acquiring ITG, the SEC issued an Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-

Desist Order, against ITG and an affiliate, finding, among other things, that "[f]rom 2010 until 2017, ITG *failed to establish adequate safeguards and procedures to appropriately limit access to systems containing* . . . *confidential trading information*." According to an SEC press release, "ITG failed to ensure that trading information was protected, and in some instances used this information to attempt to grow its business."

85.      Without admitting or denying the findings, ITG and its affiliate consented to the entry of the SEC's Order finding that they violated the antifraud provisions of the federal securities laws and agreed to pay a civil penalty of $12 million to settle the charges.

86.      The SEC's findings about ITG's failure to protect confidential trading information raised serious concerns throughout the market, including amongst Virtu stockholders, about Virtu's own ability to safeguard the extremely sensitive trading information generated and/or maintained within its different business groups. As a result, defendant Cifu embarked on a campaign to publicly address Virtu's supposed protection of the confidential client trading information that it kept on its systems.

87.      First, on Virtu's November 7, 2018 earnings call, defendants Cifu and Molluso gave a presentation about the ITG acquisition, during which defendant Cifu discussed Virtu's protection of sensitive client data, including keeping such information segregated between its different business groups. In particular, defendant Cifu stated that:

> Turning to Slide 6. You see the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have. Virtu has established policies and procedures for our existing client and market making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access control and entitlement reviews.

88.     The slide referenced by Cifu in the preceding paragraph above highlighted, among other things, Virtu's "*__existing__* safeguards to protect client information," stating, in full, as follows:



89.     During the same earnings call, defendant Cifu was asked about the concerns in the market about combining Virtu with a company that, earlier that same morning, agreed to pay a penalty of $12 million to settle SEC charges in connection with its failure to establish adequate safeguards and procedures to protect confidential trading information over a seven year period.

90.     In response to a question by an analyst from Compass Point Research & Trading ("Compass") about this issue, defendant Cifu likened ITG's misconduct to a mere "*foot fault*," addressing the issue, in pertinent part, as follows:

> [W]e're obviously very aware of the foot fault or more that they had in 2015. I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients. That's really ultimately what the issue is. And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with… When we acquired Knight in 2017, they had been in

business for over 20 years. So this is not a new phenomena. It's also not a new phenomenon that sell side, every bank that we deal with that you are very well aware, has this conflict as well.

91.     Then, on November 14, 2018, *Bloomberg* interviewed defendant Cifu for an article titled "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover[.]" The article discussed how acquiring ITG "caused some to worry that Virtu, one of modern finance's most successful traders, will snoop on its soon-to-be clients' orders, leveraging that knowledge to place winning trades before they do."

92.     Defendant Cifu described to *Bloomberg* the steps that Virtu would take to protect trading data maintained by its trade execution arm, including that the Company would "erect barriers to keep those businesses separate." Recognizing the obvious dangers associated with Virtu's proprietary traders being able to view client trading information from its execution business, defendant Cifu explained to *Bloomberg*, as follows:

> Virtu's proprietary traders -- who are based in a suburb of Austin, Texas, as well as Chicago and Dublin, far from ITG's customer-facing employees in New York and London -- won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said. Software will block proprietary traders from viewing client data. An outside auditor will vet the safeguards. And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like biometric scanners or facial-recognition software for unlocking doors.

93.     The same day, defendant Cifu sat down for an interview with *Business Insider* for an article titled "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell these anxieties[.]" *Business Insider* explained that the acquisition of ITG caused market observers to "worr[y] about Virtu's stock trading business – which trades the firm's capital – peeking into its new broker-dealer business and using that information to trade against clients."

94.     In the interview, defendant Cifu explained that he "***can't overstate how***

*important it is to me personally that client information is properly protected*." Defendant Cifu also declared, *inter alia*, that "**no other firm gives this much transparency to its clients into how their information is protected**."

95.     Then, on December 5, 2018, defendants Cifu and Molluso spoke on behalf of Virtu at the Goldman Sachs U.S. Financial Services Conference. During the conference, defendant Cifu was asked by a Goldman Sachs analyst to address the "concerns in the market" surrounding Virtu's acquisition of ITG. Cifu acknowledged that "they are all real concerns," in particular with Virtu's proprietary traders being able to access its clients' "end of the day trade file."

96.     But defendant Cifu made clear that: (i) "**there's going to be physical and virtual barriers, <u>so prop folks can't get into it</u>**"; and (ii) if Virtu was failing to protect client information, he and others at Virtu would be well-aware of it, admitting that "**we run a very small firm where everybody knows what's going on, in particular myself**, it's maybe one of the old Wall Street partnership types of places. Not going to happen, not going to happen. Why would we do that?"

97.     The concerns reverberating throughout the market about Virtu's ability to segregate and protect sensitive client trading information proved prescient. Unbeknownst to Virtu stockholders, *at that very moment*, Virtu was already engaging in the exact conduct that defendant Cifu was publicly assuring stockholders and customers would not occur – *i.e.*, its **<u>proprietary traders currently had unrestricted access</u>** into execution services customers' material non-public trading information.

98.     Nothing resembling the safeguards defendant Cifu was consistently describing publicly existed at that time to block Virtu's proprietary traders from accessing the sensitive client information in the significant trade execution business Virtu had already acquired from KCG. At that time, the only thing a proprietary trader needed to do to access a database containing *all* of the

post-trade information generated from VAM's customer orders was to type in "viewonly" or "fsviewonly" as both the username and password – which were widely known and frequently shared within Virtu.

99.     Indeed, in November 2018 – the same month defendant Cifu went on his campaign promoting Virtu's purported protection of, and restricted access to, client trading information – steps were being taken within VAM to **boost** the access that proprietary traders had to the FS Database. At that time, the main FS Database could be accessed simultaneously by 75 users using the generic login credentials described herein. Instead of decreasing the number of concurrent logins to the FS Database – or eliminating this rudimentary and wholly unsecure login method entirely until such time as proper permissioning was put into place – the main database user limit was **increased** to 125 users later that month. Significantly, this enlargement came as a direct result of complaints by traders about the database's capacity limits.

100.    The next month, December 2018, VAM's main FS Database developer conceded in internal correspondence that the project to fix the FS Database's inadequate permissioning had not yet begun, writing internally that "I was going to start on it this week but have been sidetracked."

101.    The Individual Defendants continued to falsely and misleadingly promote Virtu's information access barriers and protection of sensitive client information to stockholders. For example, on January 25, 2019, the Individual Defendants caused Virtu to issue a press release providing an update on the ITG acquisition, stating that "[p]ost-closing, Virtu intends to ***continue to maintain and enforce*** *appropriate information barriers to segment and protect sensitive client data*[.]" But there were no such information barriers in place to protect such sensitive data. At that time – a full year after sensitive post-trade information began being stored on its systems – there

was still no system in place to track which specific employees were accessing the FS Database with the generic usernames and passwords, or what information they were viewing.

102.    Indeed, until the end of February 2019, VAM did not implement a program to monitor whether employees were querying post-trade customer information in the FS Database. And once that program was finally implemented, it was immediately abandoned due to the system disruptions it caused.

103.    Despite being aware (or reckless in not knowing) that following Virtu's acquisition of KCG, essentially all Virtu employees – including its proprietary traders – had unfettered access to execution services customers' material non-public trading information, on the Individual Defendants' watch, Virtu continued to allow unrestricted access to such information with the aforementioned generic login credentials, until *at least April 2019*.

104.    For nearly five years, the Individual Defendants continued to make materially false and misleading statements about Virtu's protection of proprietary client information, never once publicly disclosing anything about the access essentially all Virtu employees had to its execution services customers' confidential trading information in the FS Database, or the significant financial, regulatory, and litigation risks Virtu faced as a result. For example, the Individual Defendants repeatedly cautioned about the potential of "*[the] failure to*" maintain or protect "*confidential and proprietary information*," when they had already failed in that regard.

## VI.    The Truth Begins to Emerge

105.    The truth about Virtu's failure to safeguard confidential client trading information emerged beginning on February 17, 2023, when the Individual Defendants caused Virtu to file its Annual Report on SEC Form 10-K for the year ended December 31, 2022 which revealed, for the first time, that "the Company has been responding to requests for information

from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."

106.    In response to this announcement, Virtu's stock declined 1.6% from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023, the next trading day.

107.    On April 28, 2023, the Individual Defendants caused Virtu to file its Quarterly Report on SEC Form 10-Q for the quarter ended March 31, 2023, which reiterated that the Company had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further revealed, in relevant part, that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and that "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."[1]

108.    In response to this news, the price of Virtu Class A common stock fell $3.19 per share, or nearly 16%, over the next four trading days from its closing price on April 28, 2023 of $20.05 per share, to close at $16.86 per share on May 4, 2023.

109.    *Bloomberg* published two articles in response to the Company's April 28, 2023 revelations. The first was an article titled "Virtu Falls After Reporting Settlement Talks Over SEC Probe," stating that "Virtu Financial Inc. shares fell 2.7% in extended trading after the firm said it

---

[1]    A Wells Notice is a communication issued by the SEC to individuals or companies who are under investigation for potential violations of the securities laws. The Wells Notice informs the recipients of the substance of the charges that the SEC intends to bring against them, and provides them with an opportunity to submit a written statement or response, known as a Wells Submission, to the ultimate decision maker.

was in settlement talks with the Securities and Exchange Commission regarding a probe into whether employees could access off-limits trading data."

110.    The second *Bloomberg* article, titled "Virtu Financial Sees Potential Wells Notice Tied to SEC Probe," stated, in pertinent part, that "Virtu Financial says in a regulatory filing it's cooperating with requests for information from the U.S. Securities and Exchange Commission in connection with a civil investigation of aspects of its information access barriers. The shares fell 5.7% in extended trading."

111.    Shortly thereafter, on May 1, 2023, *The Wall Street Journal* published an article titled "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," stating that "Shares of Virtu Financial are down more than 3% after the electronic trading firm disclosed Friday that it is facing a potential enforcement lawsuit from the Securities and Exchange Commission."

112.    Also, analysts from Piper Sandler issued a report on May 4, 2023, commenting on Virtu's disclosures and resulting stock price decline, stating, in pertinent part:

> A look at VIRT's recent disclosures about SEC investigation. VIRT's stock is down 15%+ since Friday, April 28 and has fallen every day this week. While volatility & trading volumes are down across asset classes, we suspect the decline is due to a disclosure in VIRT's 1Q23 10-Q filing (on Friday, April 28) 'warning' of a potential Wells notice from the SEC. The SEC investigation focuses on certain of aspects of VIRT's information access barriers from January 2019 to April 2019.

113.    On July 28, 2023, the Individual Defendants caused Virtu to file its SEC Form 10-Q for the quarter ended June 30, 2023, which revealed that "the Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded. The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information

barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

114.    On this news, the price of Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023.

115.    The same day, *Bloomberg* published an article titled "Virtu Is Bracing for SEC Lawsuit After Settlement Talks Fail," stating that "Virtu Financial Inc. expects to be sued by the Securities and Exchange Commission after talks failed to settle a dispute over the firm's safeguards for trading data. The shares fell in extended trading." *Bloomberg* continued, "The stock dropped more than 4% after the disclosure and was down 3.4% as of 5:45 p.m. in New York."

116.    *Finally*, the SEC issued a press release on September 12, 2023, announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information." The SEC's press release continued, in pertinent part, as follows:

> As alleged in the SEC's complaint, Virtu Americas and its affiliates operated two businesses that it purported to have walled off from each other: an order execution service for large institutional customers, whereby Virtu Americas executed customer orders, typically for a commission, and a proprietary trading business, through which Virtu Americas bought and sold securities for its own accounts and benefit. From approximately January 2018 through the beginning of April 2019, however, Virtu Americas allegedly failed to safeguard a database that contained all post-trade information generated from customer orders routed to, and executed by, Virtu Americas, including customer identifying information and other material nonpublic information. The SEC's complaint alleges that this database was accessible to practically anyone at Virtu Americas and its affiliates, including their proprietary traders, through two sets of widely known and frequently shared generic usernames and passwords. . . .

117.    In response to this news, the price of Virtu Class A common stock fell $1.07 per

share over the next four trading days, or nearly 6%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

118.     Following the announcement of the SEC Action, *Reuters* published an article on September 12, 2023 titled "SEC sues Virtu Financial for misleading customers about security of their information," stating in pertinent part:

> In a complaint filed in federal court in Manhattan, the SEC said Virtu repeatedly and falsely told customers that it used 'information barriers' and 'systemic separation between business groups' to protect their material nonpublic information.

> The SEC said that, in reality, 'anyone' at the New York-based company's Virtu Americas unit could from January 2018 to April 2019 access sensitive information about customers and their trades by using generic usernames and passwords.

> This created the risk that Virtu's proprietary traders, who were supposed to be 'walled off' from customers' trades, could use the information to benefit themselves at the expense of customers, even as Virtu accepted trading commissions from those same customers, the SEC said.

> Information that was allegedly exposed included details identifying the customers, and the names, prices and volumes of securities they bought and sold, the regulator added.

> The lawsuit seeks civil fines, the recoupment of ill-gotten gains, and an injunction against further violations.

> *          *          *

> Shares of Virtu fell 2% to $18.10 in trading after market-hours.

119.     On September 14, 2023, analysts from Citi issued a report, commenting on Virtu's price stock decline following the filing of the SEC Action against Virtu and VAM, stating, in pertinent part: "Post the SEC filing suit against VIRT on 9/12, the stock finished ***down 8.5%, shaving*** $200M+ in market cap from the stock."

## VII.    THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

120.    On November 7, 2018, the Individual Defendants caused Virtu to announce its plans to acquire ITG. On Virtu's 3Q18 earnings call, held the same day, defendants Cifu and Molluso gave a presentation to stockholders about the impending ITG acquisition. During the presentation, defendant Cifu addressed the concerns about combining Virtu's market making business with ITG's trade execution business, and discussed Virtu's protection of sensitive client information, in pertinent part, as follows:

> Turning to Slide 6. You see the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have. Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access control and entitlement reviews. Clients have entrusted their most sensitive confidential information to ITG in POSIT, in Triton, in the analytics segment. Rest assured that we will be vigilant in protecting that information. We will build on the existing safeguards ITG has employed and ensure that going forward, there continues to be physical and logical separation, monitoring, testing and training.

> Let's discuss the analytics or POSIT Alert businesses, for example. They will be located in separate physical spaces. Access will be restricted by keycard to only authorized and personnel and monitor. Technology controls will restrict logical access. Personnel will be trained to ensure adherence. In addition to monitoring and testing our safeguards and policies through internal audits, we are also looking to contract an external independent auditing firm to regularly review the effectiveness of our controls. In addition to these safeguards, Virtu is a firm believer in using technology to enhance transparency to end customer. Our tools provide the ability for institutions to have unprecedented visibility into the complete life cycles of their orders. That includes importantly why their orders were routed, not just that they were routed.

121.    Slide 6 of the presentation, referenced by defendant Cifu in the remarks quoted above, stated as follows:





122.     During the 3Q18 earnings call, an analyst from Compass asked defendant Cifu about the concerns in the market on combining a market maker with a company that – earlier that same morning – agreed to pay a penalty of $12 million to settle SEC charges in connection with its failure to establish adequate safeguards and procedures to protect confidential trading information over a seven year period. That exchange went, in pertinent part, as follows:

**Christopher John Allen - Compass Point Research & Trading, LLC, Research Division - Analyst**

Just wanted to ask, ITG's core brand has been as an independent agency broker. Obviously, Virtu is a market maker, a little bit different business. And just how do you kind of reconcile potential customer dis-synergies? What's the level of customer overlap? The onetime ITG has gotten in trouble with its customers, obviously, was the project, the Omega issue, where it was kind of hooking into market making and arguably damage its brands were digging out from there. So just trying to think about how you guys are thinking about potential revenue dis-synergies moving forward. I know you guys have talked about the percent of revenues synergies. But I think the assumption out there for the market, is there going to be at decent level of revenue dis-synergies?

**Douglas A. Cifu - Virtu Financial, Inc. - CEO & Director**

Yes, absolutely. It's a great question. Obviously, we are cognizant of it, and we have great respect for ITG brand as an independent and we're obviously very aware of the foot fault or more that they had in 2015. I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients. That's really ultimately what the issue is. And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with. And so obviously, the universe is going to know and clients will know that we are a very significant prop and retail market making firm, and we always will be. We have been in this business, the institutional business, since 2015 on a legacy Virtu basis. When we acquired Knight in 2017, they had been in business for over 20 years. So this is not a new phenomena. It's also not a new phenomenon that sell side, every bank that we deal with that you are very well aware, has this conflict as well. They've got prop market making. They've got customers and whatnot. And so there are mechanisms in place to make that happen. I would argue this actually makes the offering that much better for a couple of reasons . . . So I'm aware that customers will be concerned. I will do my best to be out there and to be transparent and talk to customers as will our entire institutional team. I think ultimately customers will see the value proposition of having a firm like Virtu and its skill set, married with a great firm like ITG.

123.    On November 8, 2018, the Individual Defendants caused Virtu to file with the SEC the Company's Form 10-Q reporting on the quarter ended September 30, 2018, signed by defendants Cifu and Molluso (the "3Q18 10-Q"). In the Management's Discussion and Analysis ("MD&A") section, the 3Q18 10-Q purported to caution against reliance on forward-looking statements contained therein, stating that "many factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] *failure to* maintain system security or *otherwise maintain* confidential and proprietary information[.]"

124.    On November 14, 2018, *Bloomberg* published an article titled "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover[.]" The article discussed how Virtu's acquisition of ITG "caused some to worry that Virtu, one of modern finance's most successful traders, will snoop on its soon-to-be clients' orders, leveraging that knowledge to place winning

trades before they do." The article continued, as follows:

> Virtu denies it'll do that and says it will erect barriers to keep those businesses separate and assuage critics' concerns. The security regime will be overseen by a client-data governance committee made up of representatives from investment firms, Virtu Chief Executive Officer Doug Cifu said in an interview this week.
>
> "We're going to empower folks on the buy side -- our clients -- to assist us in how we design and implement these barriers," he said, declining to name potential members. "***If you're upfront about things and transparent about how you do things, not only does it eliminate the bogeyman factor, it's the best sales pitch we have***."
>
> ***Virtu's proprietary traders*** -- who are based in a suburb of Austin, Texas, as well as Chicago and Dublin, far from ITG's customer-facing employees in New York and London -- ***won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said. Software will block proprietary traders from***
>
> ***viewing client data***. ***An outside auditor will vet the safeguards***. And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like ***biometric scanners or facial-recognition software*** for unlocking doors.
>
> "If that's what people want us to do, that's what we'll do," he said.

125.    Also on November 14, 2018, *Business Insider* published an article titled "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell those anxieties[.]" The article noted that the acquisition of ITG caused market observers to "worr[y] about Virtu's stock trading business – which trades the firm's capital – peeking into its new broker-dealer business and using that information to trade against clients."

126.    The article continued, "[i]t's an issue that's important to CEO Doug Cifu [who] said in an interview that the firm is building a committee of global clients to oversee the firm to ensure that data is protected." The article quoted defendant Cifu, as follows:

> Our first order of business is to take the great ITG products, Analytics, Workflow Technology, and Commission Management Aggregation products and invest in them, and of course, we're going to enhance safeguards and transparency around the protection of client data.

*I can't overstate how important it is to me personally that client information is properly protected and, to that end, we're talking to the buy-side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and physical barriers*. It's still early and we are engaging the buy-side, getting their input, but the idea is that clients would oversee the management of their data and be empowered to recommend and engage an outside auditing firm and the meetings will be open to all clients.

The committee concept is an extension of our history of always pushing for more transparency and using technology to deliver more transparency. *This is a good thing – no other firm gives this much transparency to its clients into how their information is protected*.

127.     On December 5, 2018, defendants Cifu and Molluso spoke on behalf of Virtu at the Goldman Sachs U.S. Financial Services Conference. During the conference, they were asked about the concerns in the market about Virtu's acquisition of ITG. That exchange went, in pertinent part, as follows:

**Alexander Blostein Goldman Sachs Group Inc., Research Division - Lead Capital Markets Analyst**

On the -- that was helpful by the way. On the other end of the ledger, there is, obviously, some concerns in the market around revenue synergies and really, coming from a couple of places, it's marrying a Market Maker with a dark pool operator. Or having a Market Maker run just a product that will contain a lot of valuated information before it. So what's been response from clients so far, so the customers of ITG, that [focus] your deal and how do you manage these?

**Douglas A. Cifu Virtu Financial, Inc. - CEO & Director**

Sure. I mean, they are all real concerns, right? And so we don't marginalize any of them. We address them right at front. On the dark pool side, that I'm very unconcerned about because today, we run a dark pool called Match it, all right. And a lot of brokers, like Goldman Sachs, run a dark pool, right? And also have Market Making, right? So I think the buy side is very comfortable with that. That is really not a concern, it's -- candidly nobody has raised that with me as an issue. I saw it in your report, but I'm happy to talk to whoever told you that, but no one has raised that with me. I think the larger concern is, hey, ITG has historically been a valued analytics provider, right? I don't want you to send to Virtu, which is a prop Market Making firm[, m]y end of the day trade file because somehow they are going to reverse engineer what I'm doing. What -- I've had proactively a dozen conversations with the large influencers and the 800-pound gorillas, if you will, on the buy side. And we, obviously, cooperated

with a couple of articles, if you Google around, to Bloomberg, and we had some ideas about creating a buy side governance panel, which people really liked. And we've educated the sales force at ITG to say, listen: one, we're never going to do that; two, there's going to be contractual restrictions against that; three, there's going to be physical and virtual barriers, so prop folks can't get into it; and four, at the end of the day, we run a very small firm where everybody knows what's going on, in particular myself, it's maybe one of the old Wall Street partnership types of places. Not going to happen, not going to happen. Why would we do that?

128.    On January 25, 2019, the Individual Defendants caused Virtu to issue a press release, filed with the SEC on Form 8-K, about the ongoing acquisition of ITG. The press release stated, in pertinent part, that "[p]ost-closing, Virtu intends to **_continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data[.]_**"

129.    On February 7, 2019, Virtu held its 4Q18 earnings call. In the question-and-answer session of the earnings call, defendant Cifu was asked about the concerns in the market regarding Virtu's acquisition of ITG, in particular, as described by Cifu, "the initial concern around we're adding an additional conflict because ITG, historically has been an agency business." That exchange went, in pertinent part, as follows:

**Richard Henry Repetto Sandler O'Neill + Partners, L.P., Research Division - Principal of Equity Research**

So I've already gotten an e-mail saying that -- it sounds like that you're more bullish on the ITG acquisition. And I guess the question is, we've talked to clients, we know you've been out, as you said in the prepared remarks. I was talking to clients and just some feedback and why the feedback we've gotten has been incrementally positive? And how are you getting people over -- or getting to that more positive view? A couple of people that we talked to certainly were more positive after they talked with you. If you could expound on that?

**Douglas A. Cifu Virtu Financial, Inc. - CEO & Director**

Sure. Yes. Thank you, and good morning, Rich. Yes, I think it's really two elements to that. The first is, you're right. We've been out there, we've talked to dozens and dozens of ITG customers, both here in Canada and in Europe, and I think this is obviously the initial concern around we're adding an additional conflict because ITG, historically has been an agency business. And we're -- we

get that, we are very sensitive to that, and we're very direct and transparent about that. I think they like the transparency and the directness of Virtu. We have no other way of conducting business. There's no gray area at Virtu. It's all black-and-white, and so we've been very upfront about how we will physically and virtually separate the businesses to ensure that we are good stewards of customer information, all the things you would expect that we do, and I think customers are encouraged to hear those words.

130.    On or about March 1, 2019, the Individual Defendants caused Virtu to post a letter on the Company's website from defendant Cifu to Virtu's clients, announcing the completion of the ITG acquisition. The letter, signed by defendant Cifu stated, in pertinent part, as follows:

> ***Prior to merging, both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data. As we integrate, we will draw on the best practices of our combined company to continue to ensure that our policies, procedures and tools remain designed to safeguard confidential client information***. These safeguards will include physical and logical separations, where appropriate, between businesses and access control procedures.

131.    On March 1, 2019, the Individual Defendants caused Virtu to file with the SEC its Annual Report on Form 10-K for the year ending December 31, 2018, signed by defendants Cifu, Molluso, V. Viola, Cruger, Nixon, Quick, Grano, M. Viola and Urban (the "2018 Form 10-K"). In the MD&A section, the 2018 Form 10-K purported to caution against reliance on forward-looking statements contained therein, stating that "many factors could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] ***failure to protect confidential and proprietary information[.]***"

132.    On March 13, 2019, the Individual Defendants caused Virtu to file a Current Report on Form 8-K with the SEC, which included as an exhibit, a presentation Virtu stated it planned to use at the FIA International Futures Industry Conference on March 13, 2019, and "from time to time thereafter in connection with presentations to stockholders and potential stockholders, clients and potential clients, industry analysts and others." The following slide was part of that

presentation deck:



133.     On May 3, 2019, Virtu held its 1Q2019 earnings call. In his prepared remarks, defendant Cifu stated, in pertinent part, as follows:

> Also, as you may recall, when the deal was announced, ***we promised to provide unparalleled transparency into how we protect client information***. I'm pleased to report that on April 9 and April 30, we held our first client information security forums in New York and London, respectively. We had over 100 clients and prospective clients attend in person or participate via telephone and Webex. These forums are one element of our continuous commitment to our clients, and we look forward to similar engagements in other regions.

134.     On May 10, 2019, the Individual Defendants caused Virtu to file an SEC Form 10-Q for the quarter ended March 31, 2019, signed by defendants Cifu and Molluso (the "1Q19 10-Q"). In the MD&A section, the 1Q19 10-Q purported to caution against reliance on forward-looking statements contained therein, stating that "many factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the]

*failure to protect confidential and proprietary information[.]*"

135.     On June 5, 2019, defendant Cifu represented Virtu at the Sandler O'Neill Global Exchange and Brokerage Conference. In response to a question about potential "revenue dissynergies" from the ITG acquisition, defendant Cifu addressed the concerns about combining Virtu's market making business with ITG's execution business, stating, in pertinent part, as follow:

> Yes, I mean we had guided towards $10 million of revenue dissynergies because people are running around with their hair on fire that like, all these analytics and Triton customers are going to turn us off And so we had guided to that number.
>
> On the last earnings call, and I'll repeat what I said, we're going to be within that number. I mean there are certain customers that are doing a review of Virtu like we were a new broker and I'm totally fine with that, as they should. There's a small handful of customers that can't get themselves comfortable because we're a "market- making" or HFT firm but it's really going to be ultimately de minimis. ***The large asset managers and the fashion forward, if you will, hedge funds and others and quant firms that kind of understand what we are and recognize we didn't buy ITG to steal customer information. It's kind of preposterous and borderline insulting to suggest we would do that. We would never do that***. So people are sticking with us, they're giving us the benefit of the doubt here.

136.     From August 9, 2019 through May 3, 2022, the Individual Defendants caused Virtu to file Quarterly Reports and Annual Reports with the SEC on Forms 10-Q and 10-K, signed by the Individual Defendants as follows:

| Date | Document | Defendant Signatories |
|---|---|---|
| August 9, 2019 | Form 10-Q for the quarter ended June 30, 2019 | Cifu and Molluso |
| November 8, 2019 | Form 10-Q for the quarter ended September 30, 2019 | Cifu and Ioffe |
| February 28, 2020 | Form 10-K for the year ended December 31, 2019 | Cifu, Ioffe, V. Viola, Cruger, Gambale, Grano, Nixon, Quick, Urban, M. Viola |
| May 11, 2020 | Form 10-Q for the quarter ended March 31, 2020 | Cifu and Ioffe |

| August 7, 2020 | Form 10-Q for the quarter ended June 30, 2020 | Cifu and Ioffe |
| November 6, 2020 | Form 10-Q for the quarter ended September 30, 2020 | Cifu and Galvin |
| February 25, 2021 | Form 10-K for the year ended December 31, 2020 | Cifu, Galvin, V. Viola, Cruger, Gambale, Grano, Nixon, Quick, Urban, M. Viola |
| May 7, 2021 | Form 10-Q for the quarter ended March 31, 2021 | Cifu and Galvin |
| August 4, 2021 | Form 10-Q for the quarter ended June 30, 2021 | Cifu and Galvin |
| November 3, 2021 | Form 10-Q for the quarter ended September 30, 2021 | Cifu and Galvin |
| February 18, 2022 | Form 10-K for the year ended December 31, 2021 | Cifu, Galvin, V. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick, Urban, M. Viola |
| May 3, 2022 | Form 10-Q for the quarter ended March 31, 2022 | Cifu and Galvin |
| August 2, 2022 | Form 10-Q for the quarter ended June 30, 2022 | Cifu and Galvin |
| November 3, 2022 | Form 10-Q for the quarter ended September 30, 2022 | Cifu and Galvin |

137.     In the MD&A section of each of Virtu's SEC filings included in the preceding list, the Individual Defendants purported to caution against reliance on forward-looking statements contained therein, stating that "many factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] *failure to protect confidential and proprietary information[.]*"

138.     On February 17, 2023, the Individual Defendants caused Virtu to file its SEC Form 10-K for the year ended December 31, 2022, signed by defendants Cifu, Galvin, V. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick, Urban and M. Viola (the "2022 Form 10-K"). The 2022 Form 10-K revealed that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects

of the Company's information access barriers."

139.    On this news, the price of Virtu Class A common stock declined $0.33 per share, or 1.6%, from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023, the next trading day.

140.    Then, on April 28, 2023, the Individual Defendants caused Virtu to file its SEC Form 10-Q for the quarter ended March 31, 2023, signed by defendants Cifu and Galvin (the "1Q23 10-Q"). The 1Q23 10-Q reiterated that the Company had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further disclosed, in relevant part, "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

141.    On this news, the price of Virtu Class A common stock fell $3.19 per share, or nearly 16%, over the course of the next four trading days, from its closing price on April 28, 2023 of $20.05 per share, to close at $16.86 per share on May 4, 2023.

142.    Next, on July 28, 2023, the Individual Defendants caused Virtu to file its SEC Form 10-Q for the quarter ended June 30, 2023, signed by defendants Cifu and Galvin (the "2Q23 10-Q"), which, in pertinent part, stated as follows:

> The Company and its subsidiaries are subject to several of these matters at the present time, including, among others, a matter in which the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's internal information access barriers. The Company has continued to cooperate with this civil investigation and engaged in settlement discussions. The

Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded. The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period.

143.    On this news, Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023.

144.    Finally, on September 12, 2023, the SEC issued a press release announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information." The SEC's press release continued, in pertinent part, as follows:

As alleged in the SEC's complaint, Virtu Americas and its affiliates operated two businesses that it purported to have walled off from each other: an order execution service for large institutional customers, whereby Virtu Americas executed customer orders, typically for a commission, and a proprietary trading business, through which Virtu Americas bought and sold securities for its own accounts and benefit. From approximately January 2018 through the beginning of April 2019, however, Virtu Americas allegedly failed to safeguard a database that contained all post-trade information generated from customer orders routed to, and executed by, Virtu Americas, including customer identifying information and other material nonpublic information. The SEC's complaint alleges that this database was accessible to practically anyone at Virtu Americas and its affiliates, including their proprietary traders, through two sets of widely known and frequently shared generic usernames and passwords. . . .

145.    In response to this news, Virtu Class A common stock fell $1.07 per share over the next four trading days, or nearly 6%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

## VIII.    THE SUSTAINED SECURITIES ACTION

146.     On May 19, 2023, plaintiff Lindsay Hiebert initiated the Securities Action against Virtu and the Officer Defendants for alleged violations of federal securities laws in the U.S. District Court for the Eastern District of New York. Various movants requested thereafter to be appointed lead plaintiff, and on November 21, 2023, the Court appointed the City of Birmingham Retirement and Relief System as lead plaintiff and re-captioned the Securities Action as *In re Virtu Financial, Inc. Securities Litigation,* Case No. 23-cv-3770 (NGG) (PK).

147.     On January 22, 2024 a new operative complaint was filed in the Securities Action. *Dkt. No.* 39. A motion to dismiss was subsequently fully briefed and U.S. District Judge Nicholas G. Garaufis ("Judge Garaufis") denied, in large part, that motion by order dated March 17, 2025. *Dkt. No.* 58 (the "MTD Order").

148.     The MTD Order analyzed the alleged misstatements by the following categories: (1) statements about Virtu's commitment to transparency to safe- guarding client information; (2) descriptions of Virtu's policies and procedures designed to protect confidentiality; (3) statements about Virtu's plans to enhance its safeguards post-ITG acquisition; (4) Virtu's risk disclosures about any failure to protect confidential information; and (5) statements made post-April 2019, after the FS Database Issue was resolved. Importantly, Judge Garaufis found that the lead plaintiff had adequately alleged, notwithstanding the materially heightened pleading standards of the Private Securities Litigation Reform Act (the "PSLRA"), that the defendants had "made material misrepresentations with respect to all the statements contained in Categories 1, 2, 4, and 5." MTD Order at 10. Judge Garaufis also found that the lead plaintiff had adequately alleged scienter based on, among other things, circumstantial evidence of recklessness. *Id.* at 56. Following the entry of the MTD Order, the Securities Action will move into the discovery phase

of litigation and towards trial.

## IX.    THE SUSTAINED SEC ACTION

149.    The SEC filed the SEC Action against Virtu and its wholly-owned operating subsidiary, VAM, on September 12, 2023 in the U.S. District Court for the Southern District of New York. The SEC Action is captioned *Securities and Exchange Commission v. Virtu Financial, Inc. et al.,* Case No. 23-cv-8072 (S.D.N.Y.) (the "SEC Action"). The SEC Action generally alleges the following:

> Defendants repeatedly — and falsely — told their institutional customers and the public that VAL [Virtu Americas, the operating entity] used "information barriers" and "systemic separation between business groups" in order to safeguard these customers' MNPI. In fact, VAL did not place this information behind information barriers that safeguarded MNPI. During a 15-month period, virtually all employees at VAL and its affiliate broker-dealers could access MNPI regarding its customers' trades, which included the name of the customer, the name of the security purchased by the customer, the side (buy or sell), the execution price, and the execution volume.

> Defendants provided access to this information, regardless of whether the employee had a valid business need for such information. Such trading information, when collected in this form, constitutes MNPI, and access to such MNPI could be valuable to a trader.

> For example, a trader could observe that VAL had executed the orders of a large institutional customer throughout the day, understand that the same customer may follow a similar trading pattern over the next day or days, and take advantage of such information by trading ahead of the customer's subsequent orders.

> Specifically, from at least January 2018 through April 2019 (the "Relevant Period"), VAL maintained a primary database for daily business operations and a backup database (collectively, the "FS Database") that contained all post-trade information generated from VAL's customer orders — including, among other things, specific customer-identifying information, the security name, the side (buy or sell), and the execution price and volume.

> Due to the lack of effective information barriers during the Relevant Period, anyone at VAL, including proprietary traders at VAL and its affiliates, was able to directly access the FS Database and its MNPI using a widely known and frequently shared generic username and password. This was so even though

VAL purported to prohibit proprietary traders from accessing post-trade information from VAL's customers to prevent the risk of misconduct.

Despite specific discussions of the deficiency occurring no later than August 13, 2018, VAL did not fix it until at least April 2, 2019. During the Relevant Period, VAL made materially misleading statements, and omissions which rendered other statements materially misleading, to at least six customers regarding the purported information barriers at VAL. VAL's parent, VFI, also made similar materially misleading statements and omissions, which rendered other statements materially misleading, regarding purported information barriers in two public presentations and a press release.

Before VAL implemented appropriate information barriers in the FS Database in April 2019, Defendants also issued a letter to VAL customers falsely stating that VAL maintained procedures to segregate and protect sensitive customer data, when VAL did not do so. Throughout the Relevant Period, in addition to disseminating these materially misleading statements and omissions, which rendered other statements misleading, VAL and VFI took further steps described herein to engage in a practice or course of conduct that operated or would operate as a fraud or deceit upon purchasers. Their conduct violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)–(3)].

VAL also failed to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of MNPI. This was particularly important given the nature of VAL's business. It operated both a proprietary trading business, in which it bought and sold securities in its own account and for its own benefit, as well as a trade execution business for its large institutional customers, whereby it executed buy or sell orders from customers, typically for a commission.

 Dkt. No. 1 at 1-3.

150.    The SEC later filed an amended complaint and subsequently a motion to dismiss

was fully briefed. U.S. District Judge John G. Koetl denied Virtu's motion to dismiss by order

dated August 9, 2024. Dkt. No. 43. The Company's Amended Answer to the operative complaint

in the SEC Action admits, *inter alia*, that: "(1) in or around August 2018, VAL identified the

possibility that non-permissioned post-trade data on the FS Database could hypothetically be

accessed; and (2) after discovering this hypothetical possibility, VAL developers promptly began

considering solutions before fully and successfully implementing a solution in April 2019." *Dkt.*

*No.* 52 at 3. Thus, Virtu admitted that the Company was ***aware of*** the issue as early as ***August of 2018***, yet failed to disclose this matter to stockholders for ***more than five years***. The SEC Action is currently set for trial in December 2025.

## X.    DAMAGES TO VIRTU

151.    Virtu has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

152.    As a direct and proximate result of the Individual Defendants' conduct, Virtu has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

> a.    legal fees associated with the lawsuits filed against Virtu and its officers and directors for violations of the federal securities laws, including the sustained Securities Action and the sustained SEC Action;

> b.    loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

> c.    amounts paid to outside lawyers, accountants, and investigators in connection with investigations, including but not limited to the SEC investigation and Securities Action; and

> d.    loss of revenues and profits.

## XI.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

153.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other misconduct.

154.     Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since October 2018, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

155.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

156.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

157.     The Board currently consists of ten (10) directors: defendants V. Viola, Cifu, M. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick and Urban.  A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal.  Plaintiff has adequately alleged that there is reason to doubt that at least five (5) current directors of Virtu are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.     Defendant Cifu Is Not Independent

158.     Defendant Cifu is not an independent director because there is reason to doubt that defendant Cifu is capable of independently considering a demand to commence and vigorously prosecute this action.  Defendant Cifu's principal professional occupation is his employment as CEO of Virtu.  As CEO of the Company (and a co-founder), defendant Cifu has earned and stands to earn tens of millions of dollars in annual salary, bonuses, and other compensation.

159.     Defendant Cifu is also a longtime business associate and partner of Virtu co-

founder V. Viola. For example, defendant Cifu is the "Vice Chairman, Partner, and Alternate Governor of Sunrise Sports & Entertainment (SSE), the National Hockey League's Florida Panthers, FLA Live Arena, and SSE's additional operating entities." Each of these entities is owned by defendant V. Viola.

160.    Accordingly, defendant Cifu is incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A, including its most recent 2024 Proxy, also admit that defendant Cifu is not an independent director.

**B.    Defendant V. Viola Is Not Independent**

161.    Defendant V. Viola is not an independent director because there is reason to doubt that defendant V. Viola is capable of independently considering a demand to commence and vigorously prosecute this action. Defendant V. Viola is a co-founder of Virtu and continues to serve as its "Chairman Emeritus". Moreover, defendant V. Viola is the father of defendant M. Viola. The Company's Proxy Statements on Form DEF 14A, including its most recent 2024 Proxy, also admit that defendant V. Viola is not an independent director.

162.    Further, Defendant V. Viola owns the Florida Panthers, a professional hockey team in the National Hockey League, while defendant Cifu as alleged above is the Vice Chairman, Partner, and Alternate Governor of Sunrise Sports & Entertainment (SSE), the Florida Panthers, FLA Live Arena, and SSE's additional operating entities.

163.    Accordingly, defendant V. Viola is incapable of independently considering a demand to commence and vigorously prosecute this action.

**C.    Defendant M. Viola Is Not Independent**

164.    Defendant M. Viola is not an independent director because there is reason to

doubt that defendant M. Viola is capable of independently considering a demand to commence and vigorously prosecute this action. Indeed, the Company's Proxy Statements on Form DEF 14A, including its most recent 2024 Proxy, admit that defendant M. Viola is not an independent director. M. Viola is the son of defendant V. Viola, the Company's co-founder and a fellow Board member, and currently serves as the "President" of the Viola Family Office, a private investment office for the family of defendant V. Viola.

165.    Accordingly, defendant M. Viola is incapable of independently considering a demand to commence and vigorously prosecute this action.

### D. Defendants V. Viola and M. Viola Dominate and Control the Board

166.    The Company employs a multi-class stock structure designed to vest absolute control in the Company with the Viola family and defendant Cifu. According to the Company's most recent Proxy Statement on DEF 14A, defendants V. Viola and M. Viola together jointly own approximately 68 million shares (or 42.8%) of the Company's Class A common stock. This translates to 100% of the Company's Class B shares, providing defendants V. Viola and M. Viola together with ***86.9% of the voting power***. Add to that fellow co-founder defendant Cifu's 3.2% of Class A shares, and these three Board members control a whopping 87.8% of the voting power in Virtu.

167.    Thus, Virtu is a controlled company by the Viola family. Each director of Virtu serves at the whim and pleasure of defendants M. Viola, V. Viola and Cifu. As such, no other supposedly "independent" director is actually independent, given they can be replaced on the Board at the will or whim of defendants M. Viola, V. Viola and Cifu.

### E. All Ten Current Board Members Face a Substantial Likelihood of Liability For Signing False and Misleading SEC Form 10-Ks

168.    As alleged herein, defendants Cifu, V. Viola, Cruger, Gambale, Grano, Minieri,

Nixon, Quick, Urban and M. Viola each signed at least one of the Company's materially incomplete, misleading, and deceptive SEC 10-Ks during the Relevant Period. Thus, even putting aside that these directors turned a deliberate blind eye to materially false and misleading statements alleged herein that were made by certain other Individual Defendants – in connection with the Company's SEC Form 10-Ks, they participated in making false and misleading statements to stockholders themselves.

169. It is well-established that a substantial likelihood of liability exists where there is a conscious disregard of a duty to act. Demand is regularly excused under Delaware law where, based on the facts alleged, it is reasonable to infer that directors consciously failed to take such action, in violation of their duties of loyalty and good faith.

170. Under Delaware law, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to a derivative claim. Directors who issue false and misleading statements to shareholders are considered to be interested for purposes of pre-suit demand.

171. Conscious disregard for the truth or falsity of statements issued on behalf of the corporation is a breach of the non-exculpable duties of loyalty and good faith. When public representations are made to shareholders, directors are duty-bound to ensure that those statements are complete and truthful. A fiduciary may be held liable for making a material misdisclosure, or if he or she authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad

faith -- in other words, dishonestly -- fails to correct the misleading impression created by the earlier communication.

172.    Based on the facts alleged herein, the only reasonable inference is that: (a) defendants Cifu, V. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick, Urban and M. Viola knew and approved of or consciously disregarded the issuance of the series of false and misleading statements made during the Relevant Period; and (b) in fact joined in making materially incomplete, misleading, and deceptive statements to stockholders in the Company's SEC Forms 10-K.

173.    Accordingly, defendants Cifu, V. Viola, Cruger, Gambale, Grano, Minieri, Nixon, Quick, Urban and M. Viola each face a substantial likelihood of liability, excusing demand.

F.    **Defendants Cruger, Grano, Minieri and Nixon Face a Substantial Likelihood of Personal Liability Based on their Failures as Audit Committee Members**

174.    As alleged herein, defendants Cruger, Grano, Minieri and Nixon serve as members of the Audit Committee.  Per the Audit Committee Charter, the members of the Audit Committee are responsible for, among other things, reviewing and discussing all Company press releases regarding financial results and any other information provided to securities analysts and rating agencies, reviewing significant deficiencies in the design or operation of the Company's internal controls, and reviewing any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

175.    Defendants Cruger, Grano, Minieri and Nixon and the Audit Committee, among other things, caused and/or permitted the Company to issue a series of false and misleading public statements complained of herein, and to adopt ineffective internal controls over its disclosure and financial reporting. In addition, upon information and belief, notwithstanding the serious

allegations that have been raised in the sustained SEC Action and the sustained Securities Action, there is no evidence the Audit Committee has conducted any inquiry whatsoever into the events giving rise to the SEC Action or the Securities Action. Accordingly, there is reason to doubt that defendants Cruger, Grano, Minieri and Nixon would respond to a stockholder demand impartially and disinterestedly, and they each face a substantial likelihood of liability.

## XII.    CLAIMS

## COUNT I

### Against Defendants Cifu, Molluso, Ioffe, and Galvin for Contribution Under Section 21(D) of the Exchange Act

176.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

177.    The misconduct of defendants Cifu, Molluso, Ioffe, and Galvin as described herein has exposed the Company to significant liability under various federal securities laws.

178.    Virtu and defendants Cifu, Molluso, Ioffe, and Galvin are named as defendants in the related Securities Action that alleges and asserts claims arising under the federal securities laws. Virtu is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

179.    If Virtu is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of defendants Cifu, Molluso, Ioffe, and Galvin as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Virtu is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

180.    As officers and directors, defendants Cifu, Molluso, Ioffe, and Galvin had the

power or ability to, and did, control or influence, either directly or indirectly, Virtu's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

181.    These defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

182.    Defendants Cifu, Molluso, Ioffe, and Galvin have damaged the Company and are liable to the Company for contribution.

183.    As such, Virtu is entitled to receive all appropriate contribution or indemnification from defendants Cifu, Molluso, Ioffe, and Galvin.

## COUNT II

### Breach of Fiduciary Duty Against the Individual Defendants

184.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.    The Individual Defendants, as current or former Virtu officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

186.    By virtue of their positions as Virtu directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

187.    Each Individual Defendant was required to: (a) use his or her ability to control

and manage Virtu in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Virtu rather than his or her own interests.

188.    By their acts alleged herein, including but not limited to causing Virtu to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

189.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

190.    Virtu has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Virtu.

193.    Plaintiff, as a shareholder and representative of Virtu, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## XIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the

amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.       Directing Virtu to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.       Awarding to Virtu restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

## XIV.    JURY DEMAND

Plaintiff demands a trial by jury.

Date: March 26, 2025                    s/*Benjamin I. Sachs-Michaels*
                                        Benjamin I. Sachs-Michaels
                                        Matthew M. Houston
                                        **GLANCY PRONGAY & MURRAY LLP**
                                        745 Fifth Avenue, Fifth Floor
                                        New York, NY 10151
                                        Telephone: (212) 935-7400
                                        Facsimile: (212) 756-3630
                                        bsachsmichaels@glancylaw.com
                                        mhouston@glancylaw.com

Rusty E. Glenn
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

Brett D. Stecker
**SHUMAN, GLENN & STECKER**
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

Richard Maniskas
**RM LAW, P.C.**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
(484) 324-6800
rmaniskas@rmclasslaw.com

*Counsel for Plaintiff Gregory Miller*

## VIRTU FINANCIAL, INC. VERIFICATION

I, Theodore Adams, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint For Breach of Fiduciary Duty and that I have authorized the filing of the Verified Shareholder Derivative Complaint For Breach of Fiduciary Duty, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 03/26/25

*Theodore Adams*
Theodore Adams (Mar 26, 2025 10:56 EDT)

THEODORE ADAMS